**In re TEPPER INDUSTRIES, Debtor.**

**CHARGER BOATS, Appellant,**

**v.**

**TEPPER INDUSTRIES, INC.; the Official Creditors Committee of Tepper Industries, and Joseph Karol, Chapter 7 Trustee, Appellees.**

BAP No. CC–86–1764 JMoV.

Bankruptcy No. LA83–23533 CA.

Adv. No. LA85–0142 CA.

United States Bankruptcy Appellate Panels of the Ninth Circuit.

Argued and Submitted March 18, 1987.

Decided June 15, 1987.

Bernard J. Hittner, Law Offices of Bernard J. Hittner, Costa Mesa, Cal., for appellant.

Douglas D. Kappler, Robinson, Wolas & Diamant, Los Angeles, Cal., for appellees.

Before JONES, MOOREMAN and VOLINN, Bankruptcy Judges.

1. The security agreement described the collateral as:
   [T]he furniture, fixtures, equipment, accounts, contract rights, leasehold, inventory, proceeds of the same or similar type hereafter acquired by the debtor, together with the proceeds of any insurance policies covering the herein described collateral, located at 7200 Hazard Ave., City of Westminster County of Orange State of California and including but not limited to the following specified items.

2. The financing statement described the collateral as:
   Furniture, fixtures, equipment, accounts, contract rights, leasehold, inventory, proceeds of the same or similar types now owned or hereafter acquired by the debtor including but not limited to any premiums from insurance policies for the premises located at: 7200 Hazard Ave., Westminster, California.

## OPINION

JONES, Chief Judge:

Appellant Charger Boats appeals the bankruptcy court's order holding that Charger's claim is unsecured. We affirm.

## FACTS

In December, 1978, the debtor, Tepper Industries, Inc. ("Tepper"), purchased a spa manufacturing business from Charger Boats ("Charger") for $180,000.00. In conjunction with the sale, Tepper executed a promissory note in favor of Charger for $128,000.00. The note was secured by a security agreement [1] and a financing statement was filed with the California secretary of state on January 8, 1979.[2]

At the time of the sale, Tepper and Charger had agreed that Tepper would use the Hazard Avenue premises (where the business was then located), rent free for 60 days after the close of escrow and that after that time, the furniture, fixtures, and equipment of the business would be moved to another location.[3] Within the 60 days, Tepper relocated and moved all of the secured property to 2122 Chestnut, Santa Ana, California. Charger was aware of the move, but amended neither the security agreement nor the financing statement. Tepper subsequently operated an additional facility at 2202 South Huron Avenue, Santa

3. Escrow instructions reflecting this agreement were signed by Charger and Tepper. Those instructions read in pertinent part:
   "Seller agrees to allow the buyer to utilize all present premises, rent free, for a period for [sic] 60 days after close of escrow. After said time period the furniture, fixtures, and equipment are to be moved to another location. The Security Agreement stemming from this escrow shall be for the location as set forth herein; however, the parties agree that said Security Agreement shall be amended to the address of the new location and an Amendment shall be filed with the Secretary of State, after the close of escrow. Said Amendment shall be handled by and between the parties and escrow holder shall not be concerned with same."
   The location referred to in the security agreement is the 7200 Hazard Ave. address.

Ana, California. In early 1983, Tepper moved from the Chestnut address to 620 East 11th Street, Los Angeles, California, and shut down the Huron Street facility.

On December 14, 1985, Tepper filed a Chapter 11 petition. Tepper later sold its inventory, furnishings, and equipment, but by the time of the sale, Tepper owned almost none of the property that had originally been located at Hazard Avenue. When Tepper purchased the business from Charger, the inventory consisted of approximately 50 spas. Tepper, however, manufactured hundreds of spas per year. When Tepper filed its Chapter 11 petition, its inventory had turned over at least once and Tepper owned none of the initial spa inventory. Moreover, the equipment Tepper used to manufacture spas changed after Tepper purchased the business from Charger and Tepper purchased new equipment. As a result, the equipment Tepper owned when it filed bankruptcy was mostly new equipment purchased after moving from the Hazard Avenue address. The remaining equipment was obsolete. Finally, Tepper had purchased the furnishings and office equipment it owned when it filed bankruptcy after moving from Hazard Avenue. Tepper, therefore, did not use any of these items while at the Hazard Avenue location.

In January, 1985 Tepper and its Official Creditors Committee commenced this adversary proceeding seeking to sell personal property of the estate (furnishings, inventory, and equipment) free and clear of liens,[4] and seeking declaratory relief regarding the validity of the liens against the same property. The assets were later sold free and clear. Tepper is holding the proceeds of the sale (approximately $65,000) pending a resolution of the declaratory relief action.

After submission of the case on stipulated facts, the bankruptcy court entered an order concluding that, although Charger originally had a valid security interest in Tepper's property at the Hazard Avenue address, Charger's claim was unsecured. Charger timely appealed.

## ISSUE

Whether the trial court properly concluded that Charger's claim against the Tepper bankruptcy estate is unsecured.

## DISCUSSION

The trial court concluded that Charger originally had a valid security interest in the property at 7200 Hazard Avenue, but that Charger's security interest was no longer valid because of (1) Tepper's subsequent moves to other locations, (2) the turnover in Tepper's inventory and equipment, and (3) Charger's failure to file a new or amended financing statement. We agree.

Under the California Commercial Code, the creation of an enforceable security interest requires that the debtor sign a security agreement containing a description of the collateral. Cal.Comm.Code section 9203. An adequate description of collateral is:

> [A]ny description of personal property or real estate is sufficient whether or not it is specific if it reasonably identifies what is described. Personal property may be referred to by general kind or class if the property can be reasonably identified as falling within such kind or class or if it can be so identified when it is acquired by the debtor.

Cal.Comm.Code section 9110. Although this section is "broadly construed to permit any description of collateral to suffice so long as it 'reasonably identifies what is described', the cases are clear that the description of the collateral may have the effect of restricting the security interest created in the security agreement." *In re Freeman*, 33 B.R. 234, 235 (Bankr.C.D.Cal. 1983) (citing *In re Amex-Protein Dev. Corp.*, 504 F.2d 1056, 1061 (9th Cir.1974)).

Two cases cited by Tepper in the court below and on appeal are analogous to the

---

**4.** In addition to Charger, Coast Bank asserted a lien against Tepper's assets. The treatment of Coast Bank's lien was resolved below pursuant to a stipulation approved by the bankruptcy court. Therefore, the only remaining issue is the validity and enforceability of the lien asserted by Charger against the proceeds of the property sold by Tepper.

case at bar, *In re California Pump and Mfg. Co.*, 588 F.2d 717, 719 (9th Cir.1978), and *In re Freeman*, 33 B.R. 234. In *California Pump*, the security agreement described the collateral as:

All of the furniture, fixtures, leasehold improvements, inventory, and accounts receivable ... located at:

California Pump & Manufacturing Co., Inc.

436 Rozzi Place

So. San Francisco, CA 94080

owned by the corporation....

588 F.2d at 719. The financing statement contained a similar address-specific description. *Id.* n. 1. The litigation in *California Pump* concerned property that was never located at the stated address but rather was located in Fresno and Hayward, California. *Id.* at 719. The court stated,

we are unable to convert a clear and unambiguous designation of personal property located in a specific place into a description of all of the debtor's personal property wherever situated. When parties freely sign an agreement covering certain property, this court will not alter the clear language the parties employ.

*Id.* Accordingly, the court held that the security agreement did not create a security interest in the Fresno and Hayward property. *Id.* at 720.

In *Freeman*, the security agreement and financing statement described the collateral as:

All furniture and fixtures and inventory of the Gold Chain Supermarkets now or at any time located or installed on the land or in the improvements at 813 State Street, Santa Barbara, California.

33 B.R. at 234. After executing the security agreement, the debtor moved its business to a different location. Although the debtor notified the creditor of the move, the creditor filed neither a new financing statement nor a new security agreement. The debtor subsequently filed bankruptcy at which time it had only a few items of inventory from the original location. *Id.* at 234–5. Relying on *California Pump*, the court concluded that:

The security interest was limited to property located at 813 State Street. The security agreement reasonably identified those items and limited them to that location. Upon abandonment of that location, those items totaling approximately $50,000 were transferred to 1307 State Street. The security interest in these items was not extinguished by this transfer, however, the security agreement no longer reasonably identified the collateral as the new inventory purchased and located at that new location. The security interest was therefore limited to those items which remained after the transfer to the new location. Those items were liquidated by the trustee and the proceeds transferred to the Bank in full satisfaction of its secured claim. What remains is merely an unsecured claim for the balance.

*Id.* at 236.

The case at bar comes within the ambit of *Freeman* and *California Pump*. Here, both the security agreement and the financing statement describe the collateral as certain property "located at" the Hazard Avenue address and Tepper, with Charger's knowledge, relocated after executing the security agreement. Nevertheless, no new or amended financing statement was filed. Accordingly, the trial court properly concluded that Charger's security interest was limited to the property Tepper owned while at the Hazard Avenue address and that Charger's claim against the estate is unsecured.[5]

Charger nevertheless argues that the trial court erred because three factors distinguish the present case from those cited above. First, Charger argues that the parties never intended to restrict the security agreement to the temporary Hazard Avenue address. However, where, as here, there is an unambiguous description of col-

---

**5.** Charger still has a security interest in property that Tepper purchased from Charger that Tepper owned when it filed bankruptcy. *See Freeman,* 33 B.R. at 236. According to the stipu-

lated facts, however, the only such property was obsolete. The secured portion of Charger's claim is therefore either very small or nonexistent.

lateral, parol evidence should not be considered. *See California Pump,* 588 F.2d at 719–20. Moreover, even if we consider evidence of intent, Charger's argument is dubious. The escrow instructions, *see supra* n. 3, indicate that the financing statement was to be amended after Tepper moved from the Hazard Avenue premises. This suggests that the security agreement was not meant to be as broad as Charger asserts. Thus, Charger's argument regarding intent is not convincing.

Second, Charger argues that the instant security agreement includes "proceeds" and "after-acquired property" of the personal property described and therefore continued to secure all property of the debtor. Charger relies upon *In re Little Brick Shirthouse, Inc.,* 347 F.Supp. 827 (N.D.Ill. 1972) and *In re Granny Frannies, Inc.,* 39 B.R. 377 (Bankr.S.C.1984). Both cases, however, are distinguishable from the case at bar. In neither case did the description of the collateral in either the security agreement or the financing statement contain the debtor's address. The court in *Brick Shirthouse* concluded that, it is unnecessary to include the location of collateral in the description when it is apparent the property would be located where the debtor does business. 347 F.Supp. at 828–9. In *Granny Frannies,* the debtor moved, without the creditor's knowledge, after executing the security agreement. The court concluded that "when a creditor has perfected his security interest by properly filing a financing statement and the debtor, without the creditor's consent, removes the collateral from its original location or transfers title to the collateral, the creditor's perfected security interest continues." 39 B.R. at 380. In neither *Brick Shirthouse* nor *Granny Frannies* does the court discuss the effect of a specific location within a collateral description on the creditor's security interest nor how a proceeds or after-acquired property clause could expand such a definition.

Finally, Charger argues that because the property it sold Tepper was all of Tepper's original assets, everything else Tepper purchased was "proceeds" of the collateral subject to its security interest. The description of the collateral, however, was limited to property "located at 7200 Hazard Avenue...." Charger fails to explain how the inclusion of the proceeds clause somehow expands this definition to cover property located elsewhere. Accordingly, the judgment of the court below is AFFIRMED.