**FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for San Marino Savings and Loan Association**

v.

**QUALITY INNS, INC., et al.**

**Civ. No. Y–86–1866.**

United States District Court,
D. Maryland.

April 26, 1990.

Daniel M. Litt, Michael H. Krimminger, Esquire, Pamela L. Sherman and John David Ferrer, Washington, D.C., for plaintiff.

David F. Albright and Harry M. Rifkin, Baltimore, Md., for defendants.

## MEMORANDUM

JOSEPH H. YOUNG, Senior District Judge.

Plaintiff, Federal Deposit Insurance Corporation ("FDIC"), as Receiver for San Marino Savings and Loan Association ("San Marino"), seeks summary judgment against Quality Hotels and Resorts, Inc. ("Quality") on all counts of Quality's Amended Counterclaim. In addition, FDIC requests entry of final judgment Counter-

claim. In addition, FDIC requests entry of final judgment on its principal claim pursuant to Fed.R.Civ.P. 54(b). The Memorandum of Points and Authorities in Support of each of the motions, Quality's Memoranda in Opposition, and FDIC's Reply briefs are presently before the Court.[1]

### I. *Factual and Procedural Background.*

This action arises from a series of transactions and events relating to the construction and operation of the Silver Creek Ski Resort, located in Slatyfork, West Virginia. Much of the factual background of this litigation is set forth in *FSLIC v. Quality Inns, Inc.,* 674 F.Supp. 522 (D.Md.1987) *aff'd in part and rev'd in part FSLIC v. Quality Inns, Inc.,* 876 F.2d 353 (4th Cir. 1989) and a detailed statement of the Court's earlier findings is not necessary for purposes of the pending motion. However, certain facts and allegations, having a direct bearing on the motions before the Court, must be noted:

On August 2, 1983, San Marino agreed to loan $27,000,000 to American Resort Services ("ARS") for the construction of the Silver Creek Resort. The loan was secured by a first deed of trust on the real property and improvements to be constructed at the ski resort. Pursuant to the terms of the Promissory Note and Security Agreement, and in accordance with Article 9 of the Uniform Commercial Code, W.Va.Code § 46-9-101 *et seq.* (1963), ARS filed a financing statement on August 15, 1983, evidencing the Security Agreement and covering:

[a]ll personal property, fixtures, machinery, equipment, furniture, furnishings, ski lifts, snowmaking equipment, vehicles, and all rents, income and profits, now owned, leased, or hereafter acquired, situated on or about or incident to the operations of [the Silver Creek Resort].

Exhibit "B", attached to FDIC's Motion for Partial Summary Judgment.

---

1. FDIC's earlier Motion for Partial Summary Judgment as to Count III of the Counterclaim has been supplemented with its Motion for Summary Judgment on all counts. Quality has responded to both motions and the Court will consider all the arguments and evidence presented in these motions.

On July 11, 1983, ARS and Quality entered into a Memorandum of Understanding designating Quality as managing agent for the ski resort in return for certain design, review and purchasing fees. Under this contract, Quality agreed to provide design and purchasing services to ARS relating to the development and management of specified facilities at the resort. Exhibit "A" attached to Quality's Memorandum in Opposition to Motion for Partial Summary Judgment.

Construction on the resort project proceeded during the late summer and fall of 1983, and the resort, partially completed, opened for the 1983–84 ski season. Throughout the construction phase and following the commencement of operations, Quality performed a variety of services on behalf of ARS and the resort.[2] Quality purchased goods, equipment and services for use in the management and operations of Silver Creek for which it received no payment. Quality did not obtain a security agreement and took no steps to perfect its security interest in the purchased goods pursuant to W.Va Code § 46–9–312. Nor did it invoke any of the Seller's remedies provided under Article 2 of the UCC.

By February, 1984, San Marino and the Federal Savings and Loan Insurance Corporation ("FSLIC")[3] had become aware that ARS was experiencing financial difficulties. However, San Marino continued to disburse loan funds for limited purposes, other than management and operations, pursuant to requests made by ARS and approved by Quality. On February 3, 1984, the Federal Home Loan Bank Board appointed FSLIC conservator of San Marino.

Thereafter, San Marino and FSLIC began to scrutinize operations closely but decided not to close the resort. ARS then requested, and Quality approved, "Disbursement Number 7" which included the funds which are the subject of the FDIC claim. The Court earlier found that these funds were designated under a line item "09–016 Furniture and Fixtures" to be used solely for furnishing condominium units at the resort. 674 F.Supp., at 525.

Quality alleges that despite ARS's failure to pay for many of the goods and services which Quality had provided under the Memorandum of Understanding, it continued making purchases in reliance on certain representations made by the officers of San Marino and FDIC. It further alleges that these purchases were necessary to keep the resort open during the remainder of the 1983–84 season.

On February 27, 1984, Quality "temporarily" ceased all purchasing for the resort due to a lack of available funds, and in April, 1984, it began withdrawing funds from an escrow account under its control as a means of obtaining payment for the debts owed by ARS. The escrow account contained the funds previously disbursed under the furniture line item; however, neither San Marino nor FSLIC were notified of the withdrawals.[4]

On May 4, 1984, FSLIC demanded an accounting from ARS regarding the amounts withdrawn by Quality.[5] However,

---

**2.** There is some evidence that, to open the ski facility in time for the 1983–84 season, Quality's management utilized a portion of the allocated construction funds for development of facilities which were temporary in nature, thereby causing cost overruns with regard to completion of permanent improvements under the original specifications. *See* J. DeFrancia letter to T. Lane, Exhibit "F", attached to Quality's Memorandum in Opposition to Partial Summary Judgment.

**3.** The FSLIC was abolished pursuant to the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, P.L. 101–73, 103 Stat. 183, and all of its assets and liabilities were transferred to the FSLIC Resolution Fund under the management of FDIC. Pursuant to section

401(f)(2) of the Act, FDIC is substituted as Receiver for San Marino and as party Plaintiff and Counterdefendant in this action.

**4.** After a trial on the merits, the Court concluded that Quality had misappropriated these funds in violation of its fiduciary duty to San Marino and its Receiver, FSLIC. 674 F.Supp., at 528.

**5.** James DeFrancia of San Marino directed his inquiry to ARS because, at that time, Quality claimed that ARS had granted it permission to use the escrow funds to pay Quality's expenses. ARS denied that such permission was granted and, concluding that this was a matter to be resolved between Quality and ARS, San Marino demanded that the funds be returned to the escrow account. *See* "Findings of Fact", *FSLIC v. Quality Inns, Inc.*, 674 F.Supp., at 526.

despite the controversy over Quality's attempts to pay itself out of the escrow account, Quality did not seek payment directly from ARS and did not request further disbursements expressly allocated for the past purchasing expenditures.

> Quality alleges that:
> FSLIC and San Marino affirmatively accepted the benefit of such goods and services without dispersing [sic] any construction loan funds allocated for such goods and services to ARS, or directly to Quality Resorts.

Quality's Memorandum in Opposition to Partial Summary Judgment, at 4–5. Agents of San Marino were aware that Quality was operating at a loss during the 1983–84 ski season;[6] however, Quality failed to provide San Marino or ARS with any clear notification of the extent of the arrearages until September 1984.[7]

On December 25, 1984, FSLIC was appointed receiver of San Marino. ARS subsequently defaulted on the construction loan payments and on October 25, 1985, the Receiver foreclosed upon the Silver Creek project under the Promissory Note and Security Agreement. The FSLIC then purchased the real and personal property constituting the Silver Creek resort for $17,100,000 as partial satisfaction of the debt which ARS owed to San Marino. Included in the property purchased at foreclosure was certain collateral allegedly "provided" to ARS by Quality, pursuant to the Memorandum of Understanding, for which Quality had not been paid. Quality's Memorandum in Opposition to Partial Summary Judgment, at 3.

FSLIC filed its complaint on April 17, 1986 seeking recovery of the misappropriated funds and on July 3, 1986, Quality filed its counterclaim for *quantum meruit* and conversion. The original counterclaim

was dismissed for failure to exhaust administrative remedies. The Court of Appeals affirmed the granting of FSLIC's claim but vacated the dismissal of the counterclaim under a 1989 Supreme Court decision.[8] *FSLIC v. Quality Inns, Inc.*, 876 F.2d 353 (4th Cir.1989). Quality thereupon amended its counterclaim adding, as an additional count, an action for the price of goods and services purchased under the July 11, 1983 Memorandum of Understanding, and increasing its demand for damages to reflect the loss incurred as a result of the judgment granting FSLIC's claim.

## II. *FDIC's Motion for Summary Judgment.*

Rule 56 of the Federal Rules of Civil Procedure provides that upon motion, summary judgment shall be rendered in favor of a defending party:

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). In ruling on a motion under Rule 56, the Court must construe the relevant evidence most favorably for the nonmoving party to determine whether, under the applicable law, that evidence is sufficient for a jury to return a verdict for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

### A. Count III: Action for the Price.

Quality asserts the rights of a creditor of ARS in an action for the price of goods and equipment which it purchased for the re-

---

**6.** *See* Transcript of Trial, July 8, 1987, Exhibit "J" attached to Quality's Memorandum in Opposition to Partial Summary Judgment (testimony of James M. DeFrancia).

**7.** *See* Exhibit "H" attached to Quality's Memorandum in Opposition to Partial Summary Judgment (B. Conrad letter to J. DeFrancia). There is some evidence supporting Quality's assertion that, despite this lack of formal notification, San

Marino had become aware of an unspecified debt owed by ARS to Quality as early as March 1983. *See* DeFrancia Deposition, Exhibit "I" attached to Quality's Memorandum in Opposition to Summary Judgment, at 19.

**8.** *Coit Independence Joint Venture v. FSLIC*, —— U.S. ——, 109 S.Ct. 1361, 103 L.Ed.2d 602 (1989).

sort during the 1983–84 ski season. W.Va. Code § 46–2–709 (1963).[9]

FDIC argues that, as a matter of law, it is entitled to the value of any property purchased by Quality which was subject to the foreclosure sale, based upon the proper application of Article 9 of the Uniform Commercial Code. W.Va.Code §§ 46–9–101 *et seq.* Specifically, it contends that, as a creditor of ARS with a perfected security interest in the collateral, it has priority over any competing interest asserted by Quality because Quality failed to avail itself of the statutory method for perfecting a purchase money security interest, and now possesses the subordinate rights of an unsecured creditor.

Quality contends that the personal property was never covered by San Marino's security agreement with ARS because the agreement only covered equipment and other items "situated on or about the real property" of the Silver Creek resort, thus excluding property removed from the Silver Creek resort prior to Quality's departure in April, 1984. It further contends that the Receiver failed to perfect a security interest by filing with the West Virginia Secretary of State. Quality's Memorandum in Opposition to Summary Judgment, at 3. In the alternative, Quality asserts that the property was never "sold" to ARS because title had not transferred and the property was never delivered. Finally, it contends that, even if San Marino had a perfected security interest in the property, Quality's interest should be given priority under U.C.C. 9–312 governing purchase money security interests.

The Court holds that this case is governed by Article 9 of the Uniform Commercial Code. Section 9–102 provides that:

(1) Except as otherwise provided ... this title applies so far as concerns any per-

sonal property and fixtures within the jurisdiction of this State

(a) To any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures ...

(2) This title applies to security interests created by contract ... and lease or consignment intended as security.

W.Va.Code § 46–9–102 (1963). There is no question that the claims arise from a foreclosure sale held pursuant to a valid security agreement between ARS and San Marino. Thus, the provisions contained in Article 9 (Secured Transactions) govern the rights to the collateral (or proceeds thereof) as between FDIC and Quality.

FDIC asserts that the "after-acquired property clause" contained in the August 2, 1983 Security Agreement created a security interest in its favor which attached to any goods purchased by Quality and later "sold" to ARS on behalf of the ski resort. FDIC's Motion for Partial Summary Judgment, at 3. Section 9–203 of the U.C.C. governs the attachment and enforceability of security interests. Subsection (1) provides that:

[Absent an express agreement to the contrary] a security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless:

(a) the collateral is in the possession of the secured party, pursuant to agreement, or the debtor has signed a security agreement which contains a description of the collateral ...;

(b) value has been given; and

(c) the debtor has rights in the collateral.

W.Va.Code § 46–9–203.

■ The Court finds that the property which is the subject of the debt claimed by Quality was adequately described in the August 2, 1983 Security Agreement and

---

**9.** The Memorandum of Understanding provided for what was essentially a fiduciary relationship between Quality and ARS. However, there is no indication that any of the purchases for which Quality claims seller's rights were made with funds drawn on ARS accounts or profits from ski operations. In addition, a management contract setting forth more specific terms

of the owner/operator relationship between ARS and Quality had been drafted but never executed between the parties. *See* Exhibit "I" attached to FDIC Motion for Summary Judgment. Thus, any express or implied agency relationship between Quality and ARS does not effect a determination of Quality's U.C.C. claims.

the Financing Statement filed pursuant thereto.[10] Specifically, the collateral was purchased for use by the ski resort as a business enterprise and consisted of ski clothing, uniforms, office supplies and food service equipment. For purposes of attachment and priority these items are properly characterized as either "equipment" or "inventory" under the Code section governing the definitions of types of collateral subject to Article 9 security interests. W.Va.Code § 46–9–109(2) and (4).[11]

The financing statement describes property "situated on or about or incident to the operations of" the resort. The Security Agreement itself does not contain the "incident to" language and is thus a more limited description of the collateral for identification purposes. However, in arguing that the property was "removed from" the real property described in the Security Agreement, Quality, in effect, concedes that the property was at some time located "on or about" the Silver Creek Resort. *See* Quality's Answers to Interrogatories attached as Exhibit "A" to Quality's brief in Opposition to Partial Summary Judgment, at 23–23.[12]

The Court concludes that the property in question was purchased by Quality for use in operating the resort and that it was in fact used and located on the resort in a manner sufficient for it to constitute after-acquired property subject to attachment. Once attachment occurs, an enforceable security interest comes into existence. This interest is not extinguished by subsequent removal of the collateral to a location other than that described in the Security Agreement. *In re Tepper Industries, Inc.*, 74

B.R. 713 (9th Cir. BAP 1987). However, attachment may only occur when the three requirements of section 9–203 have been met. 8 Hawkland, *Uniform Commercial Code Series*, § 9–302:03, at 414. When those three events occur, regardless of the order in which they occur, the security interest becomes enforceable against the debtor and third parties.

■ The second prong of Section 9–203 requires that value has been given. There can be no question that value was given to the debtor, ARS, as consideration for the security agreement through San Marino's extension of credit for the $27,000,000.00 construction loan; the debt secured by the agreement. *See In re Terminal Moving & Storage Co., Inc.*, 29 U.C.C.Rep. 679, 631 F.2d 547 (8th Cir.1980). "Value" in the form of an extension of credit is valid for purposes of the attachment of rights in collateral securing a preexisting claim. W.Va.Code § 46–1–201(44)(b); *Bank of Lexington v. Jack Adams Aircraft Sales, Inc.*, 23 U.C.C. Rep. 1008, 570 F.2d 1220 (5th Cir.1978).

Finally, the debtor must have "rights" in the collateral. Although the U.C.C. does not define the term "rights" for purposes of attachment, courts have found that "possessory" or "contractual" rights are sufficient, even if title is not transferred. Hawkland, *supra*, § 9–203:10, at 454. A more specific interpretation was given in the case of *Kinetics Technology International Corp. v. Fourth National Bank of Tulsa*, 705 F.2d 396, 399 (10th Cir.1983) requiring the debtor to have "some degree

**10.** Section 9–110 provides that: "[f]or purposes of this title any description of personal property or real estate is sufficient whether or not it is specific if it reasonably identifies what is described." W.Va.Code § 46–9–110.

**11.** "Goods are
(2) 'Equipment' if they are used or bought for use primarily in business ... or if the goods are not included in the definitions of inventory, farm products or consumer goods;
(4) 'Inventory" if they are held by a person who holds them for sale or lease or to be furnished under contracts of service or if he has so furnished them, or if they are raw materials, work in process or materials used or consumed in a business. Inventory of a person is not to be

classified as his equipment." W.Va.Code § 46–9–109.

**12.** In its answer to Interrogatory number 17, Quality states that "items used by Quality Resort in managing and operating the resort including ski patrol uniforms, ski equipment and other movable items such as cash registers and furniture and the like were moved into two large trailers leased by Quality Resorts [and later] moved to and stored at the Lodge at Snowshoe and to the Inn at Snowshoe." *See also* Deposition of William Bozack, attached as Exhibit "BB" to FDIC's Motion For Summary Judgment, at 30–31. ("all [items on the inventory] came from Silver Creek").

of control or authority over collateral placed in his possession."

ARS, as the property owner, had contractual rights under the Memorandum of Understanding in any property purchased for the resort pursuant to that agreement. In addition, it had some degree of actual control or authority over the collateral used in the ski operations pursuant to its ownership interests in the Silver Creek enterprise.[13] Although Quality, as operations manager, also exercised a degree of control over the day to day use of the collateral, the fact that it was actually used in the 1983–84 ski operations removes any question that the interest of ARS was sufficient to meet the "rights" requirement.[14]

■ Section 9–302 provides that a security interest in collateral is perfected by filing a financing statement in accordance with section 9–402. *See* W.Va.Code § 46–9–303(1) ("A security interest is perfected when it has attached and when all of the applicable steps required for perfection have been taken"). Quality contends that the Receiver failed to file a financing statement with the West Virginia Secretary of State and thus failed to perfect its security interest. Quality has presented no evidence raising a reasonable inference that the Receiver failed to perfect its security interest. In contrast, FDIC has submitted an attested copy of the financing statement filed with the Secretary of State on August 15, 1983. Exhibit 1 attached to Affidavit of Diane Kilmartin, Exhibit "EE" attached to FDIC's Reply to Opposition to Motion for Summary Judgment.[15] Accordingly, San Marino, and FSLIC as receiver, possessed a perfected security interest in the collateral as of the date of filing.

■ The Court must next consider whether Quality, as seller, retained a valid security interest in any of the goods sold to ARS, and if so, whether such interest is entitled to priority over the competing security interests of FDIC. Notwithstanding the general "first in time" priority rule set forth under U.C.C. § 9–312(5),[16] a "purchase money" security interest in equipment collateral shall have priority if the interest is perfected at the time the debtor receives possession of the collateral or within twenty days thereafter. W.Va.Code § 46–9–312(4).[17] A purchase money security interest in equipment collateral does not fall within any of the exceptions contained in U.C.C. § 9–302, and therefore, a financ-

---

**13.** William Bozack, Quality's manager at Silver Creek, testified as follows:

Q. Did you have an understanding that ARS was the owner of the goods in the trailer?
A. Yes.
Q. Did at any time you were there, did Quality ever tell you they were going to take the position that they had never delivered the goods to ARS?
A. No.
Q. In fact, you did deliver the goods … .
A. I guess if you mean taking responsibility for the theft and well-being of them. I guess yes.

Deposition of William Bozack, attached as Exhibit "BB" to FDIC's Motion for Summary Judgment, at 99–103.

**14.** Quality's manager testified at deposition that the Inn and Snowshoe, where the collateral was stored after removal from the Silver Creek location was also owned by the owners of ARS. This evidence is uncontroverted and indicates that ARS continued to exercise some degree of actual control even after the collateral was relocated. Bozack Deposition, *supra.*

**15.** The Affiant refers to an inquiry she made to the West Virginia Secretary of State concerning all U.C.C. filings on record for debtor, American

Resort Services. The Secretary of State responded with an attested copy of a financing statement describing the collateral and dated August 15, 1983. Although the filing date is illegible on the copy attached as Exhibit "FF" to Plaintiff's Reply Brief, Plaintiff has subsequently submitted to the Court a clearly legible reproduction of the financing statement, removing any question as to the filing date of that document.

**16.** Unless provided otherwise by specific rules, the general rule is that priority is determined in the order of filing if conflicting security interests are both perfected by filing, otherwise, priority is determined in the order of perfection. W.Va.Code § 46–9–312(5) (1963).

**17.** Similarly, a purchase money security interest in "inventory" collateral has priority if perfected at the time the debtor receives possession and notification is given to any known secured creditors holding security interests in the same collateral. Neither requirement has been fulfilled by Quality in this case. W.Va.Code § 46–9–312(3).

ing statement must be filed to perfect that interest.

■ Quality does not contend that it filed a financing statement describing the collateral purchased with the "advanced" funds and bought by FSLIC at the foreclosure sale. In fact, Quality does not assert, and the evidence fails to disclose, any security agreement in favor of Quality, perfected or unperfected. Such a security agreement, either oral or written, is expressly required under U.C.C. 9–312 before a purchase money security interest can be perfected by filing *or by possession.* Thus, Quality's alternative argument that it had a perfected purchase money security interest based on its possession of the collateral fails as a matter of law.

Quality also contends that the evidence supports a finding of bad faith on the part of San Marino and FSLIC which alters the normal priorities under U.C.C. Article 9. Quality refers to the holdings in *Thompson v. United States,* 408 F.2d 1075 (8th Cir. 1969) and *General Insurance Company of America v. Lowry,* 412 F.Supp. 12 (S.D. Ohio) *aff'd* 570 F.2d 120 (6th Cir.1978) in support of a bad faith exception.

■ Obviously all Article 9 transactions are subject to the "good faith" requirement of U.C.C. § 1–203, and a finding of lack of good faith may render unenforceable an otherwise valid security interest. However, the cases cited by Quality involved bad faith or fraud in the *acquisition* of the security interest. *See Thompson v. United States, supra,* at 1084; *General Insurance Company of America v. Lowry, supra; see also Peerless Packing Co., Inc. v. Malone & Hyde, Inc.,* 376 S.E.2d 161 (W.Va.1988). No evidence has been presented, and Quality has not alleged, that any fraud or bad faith is evidenced in San Marino's acquisition of the August 2, 1983 Promissory Note and Security Agreement. Absent such a showing, the Court is unwilling to impose an equitable lien which would override the valid security interest held by FDIC. This result is consistent with the intent of the drafters of Article 9 as stated by Official Comment number 5 to section 9–203:

Since this Article reduces formal requisites to a minimum, the doctrine [of equitable mortgage] is no longer necessary or useful. More harm than good would result from allowing creditors to establish a secured status by parol evidence after they have neglected the simple formality of obtaining a signed writing.

W.Va.Code § 46–9–203, Official Comment No. 5.

Accordingly, the Court concludes that the competing claims of FDIC and Quality, as creditors, to the proceeds of collateral purchased by Quality and delivered to the Silver Creek resort are governed by U.C.C. article 9 and that there is no genuine issue as to any material fact. FDIC is entitled to judgment as a matter of law.

### B. Count I: Unjust Enrichment and Quantum Meruit.

Having determined that the "inventory" of personal property listed by Quality in its action for the price (Count III) constituted after-acquired collateral subject to foreclosure by the Receiver, the Court must next determine whether there exists a genuine issue as to Count I of Quality's counterclaim (*i.e.,* unjust enrichment and *quantum meruit*).

"A person who has been unjustly enriched at the expense of another is required to make resititution to the other." Restatement of Restitution § 1 (1937). A party seeking recovery on grounds of unjust enrichment must establish three basic elements. These are:

1. A benefit conferred upon the defendant by the plaintiff;

2. An appreciation or knowledge by the defendant of the benefit; and

3. The acceptance for retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value.

Williston on Contracts § 1479 (3rd ed. 1970); *see Everhart v. Miles,* 47 Md.App. 131, 422 A.2d 28, 31 (1980).

■ *Quantum meruit* is a closely related doctrine which, without regard to inten-

tion or assent of the parties, describes the extent of liability on a contract implied at law. FDIC does not deny that it received a benefit from the materials and services provided by Quality to the extent such services were necessary to keep the Silver Creek resort open during the 1983–84 ski season. Testimony of James DeFrancia, Transcript, vol II, attached as Exhibit "D" to Quality's Memorandum in Opposition to Summary Judgment, at 220–221. In addition, evidence has been presented creating at least the inference that as early as March, 1984, the Receiver knew of the debt owed by ARS to Quality for services rendered. *See* Transcript of Deposition of James DeFrancia, attached at Exhibit "I" to Quality's Memorandum in Opposition, at 19.

The pivotal issue is whether it is inequitable for FDIC to retain the benefit of Quality's purchases on behalf of the resort without payment of its value.

The Supreme Court of Appeals of West Virginia held that an unsecured creditor is not entitled to maintain an equitable claim of unjust enrichment, (or *quantum meruit*), against a secured creditor for the value of collateral purchased in settlement of debt. *Peerless Packing Co. Inc. v. Malone & Hyde, Inc.*, 376 S.E.2d 161, 164 (W.Va. 1988). In thus holding, the Court reasoned that:

> although the result of disallowing an equitable unjust enrichment claim in such a case may appear harsh, the unsatisfied creditors ... could have protected themselves either by demanding cash payment for their goods, or by taking a purchase money security interest in the goods they delivered.

*Id;*[18] *see Evans Products Company v. Jorgensen*, 245 Or. 362, 421 P.2d 978 (1966).

Quality had ample notice of the financial difficulties of ARS at a time when it would have been practicable to obtain a perfected security interest in equipment purchased for the resort. Quality was also aware of the Security Agreement between ARS and San Marino. As stated *supra*, the appro-priate and most reasonable means for Quality to protect its competing interests as a creditor to ARS would have been through express agreement and perfection of a purchase money security interest in the collateral.

Quality argues that the *Peerless* rule should not apply in this case because its claim for equitable relief is based on the "wrongful and inequitable conduct of FDIC as to Quality Resorts." Quality's Memorandum in Opposition to Summary Judgment, at 32–34. Specifically, it argues that it was justified in relying upon certain representations made by James DeFrancia on behalf of San Marino creating the impression of a promise to pay the debt on behalf of ARS. The first of these representations is contained in an October 3, 1984 letter written by DeFrancia to Barry Conrad, President of Quality. Responding to Conrad's September 26, 1984 letter notifying him of outstanding arrearages held by Quality in the amount of $337,982.59, DeFrancia wrote to request a current accounting of the debt and stated:

> This information will assist us in jointly resolving this matter promptly. Be assured of our priority attention to settling this issue upon receipt of the requested information.

DeFrancia letter of October 3, 1984, attached as Exhibit "U" to Quality's Memorandum in Opposition to Summary Judgment.

The other representation to which Quality refers is a November 5, 1984 letter by DeFrancia to Conrad requesting disclosure of Quality's records relating to construction work performed on the Silver Creek project for the purpose of "assisting" San Marino in the defense of certain lien priority allegations brought by other creditors of ARS. Quality contends that these letters raise the inference that the Receiver intended to mislead Quality into assuming that the ARS debt would be paid.

There can be no question that the representations which Quality allegedly con-

---

18. However, the *Peerless* court did not purport to hold that an equitable claim for relief never

lies in a case controlled by the U.C.C. *Peerless, surpa,* at 164, n. 4.

strued as a promise to pay were made at least six months after the rendering of the services which conferred the benefit, and long after Quality's opportunity to protect its interests by alternative means, such as a perfected security interest, had expired. No reasonable inference can be made that the goods and services were provided by Quality in reliance on either the conduct or representations of the Receiver; especially since Quality provided these services pursuant to a contractual arrangement with ARS and San Marino knew of this arrangement. *See Rosenbaum v. Price*, 117 W.Va. 160, 184 S.E. 261 (1936). Under these circumstances, the statements made by DeFrancia may not reasonably be construed as an offer to pay other than in the sense of expressing a willingness to consider "settlement" of disputed claims of a competing creditor. Such an invitation to resolve competing claims through negotiation does not constitute a "promise to pay" for purposes of implying a contract between the two creditors and, as a matter of law, is insufficient to justify equitable recovery under a theory of *quantum meruit.*

Having determined that there exists no genuine issue as to any material fact relating to Quality's claims of unjust enrichment and *quantum meruit,* summary judgment on these grounds is appropriate.

### C. Count II: Conversion.

Having determined that FDIC obtained rights to the collateral pursuant to a valid security interest, Quality's claim for conversion fails for lack of an essential element of that cause of action. To establish common law conversion Quality would have to show that it was the owner, or entitled to the possession, of the property at the time of the taking. *Kisner v. Commercial Credit Co.,* 114 W.Va. 811, 174 S.E. 330, 331 (1934). The events upon which the allegations of conversion are based all occurred subsequent to the forclosure by the Receiver. The respective proprietary rights in goods subject to a foreclosure proceeding are determined according to the priority rules of Article 9 of the U.C.C. The Receiver's purchase of the goods at the forclosure sale, as a matter of

law, could not have constituted an actionable conversion. *Thompson v. Ford Motor Credit Co.,* 550 F.2d 256, 258 (5th Cir.1977); *see* W.Va.Code § 46-9-504(4).

### III. *Motion for Entry of Final Judgment.*

The Court has reviewed all the arguments and evidence submitted by the parties and construed the evidence with all reasonable inferences favoring Quality, against whom summary judgment is sought. As a result of the foregoing analysis, it is clear that Quality has failed to raise a genuine issue as to any material fact that would permit a reasonable jury to find in its favor on any of the grounds asserted in its Amended Counterclaim.

FDIC filed a motion for entry of final judgment pursuant to Fed.R.Civ.P. 54(b). Having granted FDIC's motion for summary judgment, that motion is now moot.

Accordingly, final judgment will be entered on the principal claim of FDIC pursuant to the mandate of the Court of Appeals and for the reasons stated in this Court's Memorandum and Order dated November 30, 1987, and Order dated February 2, 1988.