376 S.E.2d 161

**PEERLESS PACKING CO., INC., et al., Appellants,**

v.

**MALONE & HYDE, INC., Appellee.**

**No. 18126.**

Supreme Court of Appeals of West Virginia.

Dec. 20, 1988.

Robert B. Sayre, Beckley, for appellants.

John E. Lutz, Charleston, for appellee.

NEELY, Justice:

Appellants are twelve companies that supply wholesale products to grocery stores. Appellee is also a wholesaler of grocery products, with operations covering the southeastern states. John Kizer was appellee's co-defendant below. This is an appeal from the trial court's award of a directed verdict for appellee.

Mr. Kizer managed the A & P store in Beckley. When A & P substantially withdrew its operations from the state in 1982, Mr. Kizer decided to take over the store. He learned that appellee had acquired the lease and store equipment of the former A & P and negotiated an agreement with appellee. Under this agreement, Mr. Kizer provided $50,000 for working capital that went into the purchase of inventory. Appellee allowed Mr. Kizer to use its trade name "PIC PAC," subleased the store to Mr. Kizer, sold him the store equipment for $200,000, and provided him with approximately $187,000 in additional inventory. In exchange, Mr. Kizer gave appellee a promissory note for approximately $387,000,

plus interest, which was secured by a security interest in the present and after acquired inventory.[1]

Appellee met all requirements of the Uniform Commercial Code (UCC) for perfecting its lien against the store's collateral, and appellants do not challenge the technical validity of appellee's lien.

Mr. Kizer opened the store in November 1982. The store sold some goods in addition to those supplied by appellee. Many of these additional goods were supplied by the twelve appellant companies, who delivered the goods several times a week on open account credit extended to the store. None of appellants obtained purchase money security interests in the inventory supplied by them. Purchase money security interests could have given appellants priority over appellee's security interest in the inventory.[2]

By March 1983, it was apparent to appellee that the store was not successful because it was meeting its obligations, in part, by reducing inventory. Also, one of

Mr. Kizer's checks for the rent and note payments to appellee was returned for insufficient funds. Agents of appellee approached Mr. Kizer and told him that they were going to take the store back, and either he could voluntarily sign everything over to appellee, or "they would take everything he had." Mr. Kizer then signed a document presented by appellee called a Notice of Default and Transfer of Possession Agreement. This agreement transferred all of Mr. Kizer's rights in the store, equipment and inventory, and the balance of the store's bank account, about $64,000, to appellee. In return, appellee released Mr. Kizer from any liability, including personal liability for any deficiency, on the $387,000 note, the rent on the store and on an additional $54,000 unsecured, open account debt owed to appellee.[3]

Appellee assumed ownership of the store and began operating it with Mr. Kizer as manager. Appellee sent a letter to the appellant vendors stating that appellee had

---

1. Such a clause for "after-acquired" inventory is valid under 46–9–204(1). Consumer goods, partially excepted by section 204(2), are defined as goods that are used or bought for use primarily for personal, family or household use. *W. Va. Code,* 46–9–109(1) [1963]. The goods appellee sold to the store were clearly "inventory" rather than "consumer goods." The security agreement contains a typographical error where it provides that the amount of the loan was $587,000.

2. There are two general types of purchase money security interests (PMSI). One type is taken by a person who by making advances or incurring an obligation gives value to enable a debtor by buy the collateral. *W. Va. Code,* 46–9–107(b) [1963]. The other type, which would apply here, is one taken or retained by the seller of the collateral to secure all or a part of the purchase price. *W. Va. Code,* 46–9–107(a) [1963]. The UCC gives a special status to a PMSI that usually allows the holder of a PMSI in specific goods to prevail over the holder of a general security interest in the same goods. *W. Va. Code,* 46–9–312 [1984]. This special treatment allows someone to sell goods or lend money to a debtor or to buy goods without worrying that his security interest in the goods will be threatened by another secured creditor. When a vendor sells inventory to a debtor on credit, the vendor can obtain a PMSI in the inventory if the debtor signs a security agreement that contains a description of the collateral, value has been given

by the creditor (i.e., the inventory), and the debtor has rights in the collateral. *W. Va. Code,* 46–9–203(1) [1979]. When these conditions are met, the security interest attaches to the inventory. *W. Va. Code,* 46–9–203(2) [1979]. In the case of inventory collateral, after the PMSI has attached to the inventory, the holder of the PMSI must perfect his interest by filing a financing statement before the debtor receives the inventory and must take other steps set forth in *W. Va. Code,* 46–9–312(3) [1984], in order to prevail over the holder of a conflicting security interest in the same inventory. These other steps require that the holder of the PMSI give notice to the holder of the conflicting security interest (if the latter had filed a financing statement covering the inventory) stating that he has or expects to acquire a PMSI in inventory of the debtor, describing such inventory by item or type, and the holder of the conflicting security interest must receive the notification within five years before the debtor receives possession of the inventory. *W. Va. Code,* 46–9–312(3) [1984]. For a more detailed discussion of Article 9 and priorities thereunder, see R. Anderson, Vols. 8 & 9 *Uniform Commercial Code,* Article 9 (1985), Donald Baker, *A Lawyer's Basic Guide to Secured Transactions* (1983); Cogan, Hogan & Vagts, 1B *Bender's Uniform Commercial Code Service* (1976).

3. Mr. Kizer testified that the $54,000 was for groceries delivered by appellee on open account and not yet paid for.

realized on its security interest in the store's assets without assuming any liability to third parties, and would not pay any invoices for deliveries before 31 March 1988, the date appellee took ownership.

Appellants each sued Mr. Kizer for the unpaid accounts, and also sued appellee on a theory of unjust enrichment, with a claim for both compensatory and punitive damages. The cases were consolidated, and each appellant was granted default judgment before trial against Mr. Kizer, who discharged his obligation on the judgments in bankruptcy. At the close of appellants' case against appellee, appellee moved for a directed verdict, which the trial court granted.

## I

Appellants argue that the transfer of the store's assets was a bulk transfer, and Article 6 of the UCC, *W. Va. Code*, 46–6–105 [1963], provides that any bulk transfer is ineffective against any creditor of the transferor unless the transferee gives notice to the creditor ten days before taking possession. With regard to the $64,000 cash from the store's bank account, appellants contend that cash is not defined by the security agreement as collateral for the security interest. Appellants also contend that appellee was unjustly enriched by the transfer because appellee, knowing it was going to foreclose on the store, allowed appellants to continue to deliver goods for a week before appellee took over.

Appellants also argue that although the Notice of Default and Transfer of Possession Agreement authorized appellee to "sell the collateral at a private sale after a reasonable period," and to apply the proceeds to Mr. Kizer's indebtedness to it, no such sale was ever made. The inventory was sold in the ordinary course of the store's continuing business under ownership of appellee and the store's equipment was retained by appellee. Appellants argue that if a foreclosure sale had taken place, there might have been enough money to pay off some or all of the debt to appellants.

Appellee responds that the $64,000 cash represented "identifiable proceeds" from the sale of the inventory and, therefore, under *W. Va. Code*, 46–9–306(2) [1974], the cash was collateral for their security interest. Appellee argues that the transfer is not a bulk transfer under Article 6 of the UCC because of the exception for "transfers in settlement or realization of a lien or other security interest." *W. Va. Code*, 46–6–103(3) [1963]. Appellee contends that a theory of unjust enrichment is not applicable in a case that is governed by the UCC. Appellee argues that it was entitled to keep the collateral and that it got no more than it was owed by Mr. Kizer. In fact, appellee insists that it "lost" about $130,000 through the transfer.

The trial court agreed with appellee that an unjust enrichment claim is not applicable in a UCC case, and stated in its final order, in part,

> First, the Court concludes as a matter of law that the plaintiffs cannot maintain this action, which is governed by Article 9 of the UCC, on a theory of recovery grounded upon the equitable doctrine of unjust enrichment. *Evans Products Company v. Jorgensen*, [245 Or. 362], 421 P.2d 978 (Oregon, 1966). The Court agrees with the rationale of the Oregon Supreme Court at p. 983 that "[T]he purpose and effectiveness of the UCC would be substantially impaired if interests created in compliance with UCC procedure could be defeated by application of the equitable doctrine of unjust enrichment."

■ We agree with the trial court's order and affirm his ruling with regard to appellants' equitable unjust enrichment claim. As the Oregon Supreme Court pointed out in *Jorgensen*, cited by the trial court in the quote above, although the result of disallowing an equitable unjust enrichment claim in such a case may appear harsh, the unsatisfied creditors, (appellants in the case before us), could have protected themselves either by demanding cash payment for their goods, or by taking a purchase money security interest in the goods they delivered.[4]

---

**4.** We do not hold that an equitable claim for relief never lies in a case controlled by the UCC.

■ We must also reject appellants' argument that the transfer was a bulk transfer under Article 6 of the UCC. Section 103(3) of Article 6, *W.Va.Code*, 46–6–103 [1963] exempts from Article 6 requirements transfers "in settlement or realization of a lien or other security interest" because an unsecured creditor of the transferor is not prejudiced by a transfer of assets that satisfies the security interest of a transferee who already has priority over the unsecured creditor.

Appellants contend that the transfer does not fit under this exception because appellee used the transfer not just to settle its security interest, but to settle the "open account" debt of $54,000 owed by the store for additional inventory delivered by appellee.[5] However, the security agreement states that it secures not only payment of the $387,000 promissory note, but also "the payment of any indebtedness due for the delivery of inventory or services by Malone & Hyde, Inc. to Debtor from time to time." Section 204(3) of Article 9, *W.Va.Code*, 46–9–204(3) [1974] provides that such a clause is valid, stating:

(3) Obligations covered by a security agreement may include future advances or other value whether or not the advances or value are given pursuant to commitment.[6]

It appears that payment of the $54,000 "open account" debt was secured by the security interest in the inventory. Therefore, the entire transfer was "in settlement of a security interest," and was excepted from the bulk transfer requirement of 10 days prior notice to appellant unsecured creditors.

With regard to the $64,000 cash, *W.Va. Code*, 46–9–306(2) [1974] provides that a security interest continues in "any identifiable proceeds" from the sale or exchange of the collateral. Because this cash was from the store's bank account, it was clearly proceeds from the sale of the collateral, and appellee had a security interest in it as well.

■ Appellants argue that appellee did not properly "realize" on its security interest, and that they are owed an accounting. Section 503 of Article 9 provides, in part, that "[u]nless otherwise agreed a secured party has on default the right to take possession of the collateral." *W.Va.Code*, 46–9–503 [1963].

The security agreement had no provision limiting appellee's right to take possession of the collateral, and in the "Default Agreement," Mr. Kizer voluntarily surrendered possession of the collateral to appellee. Under the terms of the "Default Agreement," appellee and Mr. Kizer agreed that appellee could retain possession of the collateral in complete satisfaction of the debt. Section 505 of Article 9, *W.Va.Code*, 46–9–505 [1974] provides that a secured party may retain collateral in satisfaction of the secured debt and that the only parties who may object are a debtor who has paid sixty percent of the purchase price of a consumer good, or other secured parties who notify the primary secured party of their interests. Because appellants were general unsecured credi-

As appellants point out, *W.Va.Code*, 46–1–203 [1963] requires that "[e]very contract or duty within this chapter imposes an obligation of good faith in its performance or enforcement." Some courts have held that equitable claims raised under this section can change priorities explicitly provided in Article 9. *See General Ins. Co. of America v. Lowry*, 570 F.2d 120 (6th Cir.1978) and *Thompson v. United States*, 408 F.2d 1075 (8th Cir.1969). *See also* Hillman, McDonnell & Nickles, *Common Law and Equity Under the Uniform Commercial Code*, § 24.04 (1985). However, most of these cases involve situations of virtually fraudulent conduct. The UCC provides justice in the long run in large part through the certainty and predictability of its provisions, which should not be set aside absent truly egregious circumstances verging on actual fraud. In the case before us, even allowing appellants every favorable inference from their evidence, we do not believe they have presented evidence of such circumstances sufficient to disturb the priorities set by the provisions of Article 9.

5. It is true, as appellants contend, that in order to fit under the exception of *W.Va.Code*, 46–6–103(3) [1963], the *entire* consideration paid by the transferor must be used to satisfy the security interest. *See Starman v. John Wolfe, Inc.*, 490 S.W.2d 377 (Mo.App.1973).

6. "Pursuant to commitment" is defined at *W.Va. Code*, 46–9–105(k) [1979].

tors, they have no right under Article 9 to object to appellee's retention of the collateral in satisfaction of the debt.

Accordingly, for the reasons stated above, the order of the Circuit Court of Raleigh County is affirmed.

AFFIRMED.