**NINTH DISTRICT PRODUCTION CREDIT ASSOCIATION, Successor to Mountain Plains Production Credit Association, Petitioner,**

v.

**ED DUGGAN, INC., Respondent.**

**No. 90SC129.**

Supreme Court of Colorado,
En Banc.

Dec. 9, 1991.

---

Hill, Hill & Manges, P.C., Alden V. Hill and Alden T. Hill, Fort Collins, for petitioner.

Wood, Herzog, Osborn & Bloom, P.C., Charles S. Bloom, Fort Collins, for respondent.

Justice LOHR delivered the opinion of the Court.

We granted certiorari in this case to review the decision of the Colorado Court of Appeals in *Ed Duggan, Inc. v. Ninth Dist. Prod. Credit Ass'n,* 795 P.2d 1347 (Colo. App.1990). At trial the jury returned a special verdict finding that the defendant, Ninth District Production Credit Association, had been unjustly enriched and awarding the plaintiff, Ed Duggan, Inc., damages in the amount of $101,586.38. The trial court entered judgment on the verdict and the court of appeals affirmed. We conclude that the trial court erred in instructing the jury and therefore reverse the judgment of the court of appeals and direct that the case be remanded for a new trial.

## I.

## A.

This case involves claims of Ed Duggan, Inc. (Duggan Corporation) for compensation for corn delivered to a failing cattle feedlot business. The issues on certiorari review are limited to the relative rights of Duggan Corporation, an unsecured creditor of the feedlot business, and Ninth District Production Credit Association (PCA), a creditor with a security interest in the proceeds of the feedlot's accounts receivable. A summary of the facts surrounding the dispute provides the necessary context for understanding the legal issues presented. Testimony at trial was conflicting in a number of respects. In summarizing the relevant facts as presented by the evidence, we attempt to identify the areas of material conflict.

Norman Land & Livestock Company (Norman Company) owned and operated a cattle feedlot and also was engaged in the general farming business. Howard Norman was a corporate officer of Norman Company and also managed its operations. The feedlot business supplied Norman Company with its primary source of income.[1] Operating the feedlot involved caring for cattle to maturity and fattening them for slaughter. Norman Company was compensated based on the amount of weight gained by the cattle while at the feedlot. Corn was the primary growth component in the diet of the cattle, and Duggan Corporation was a principal supplier of corn to the feedlot.

Norman Company's operations were financed by PCA. PCA had made annual operating loans to Norman Company beginning in 1978 and held a perfected security interest in the company's accounts receivable and other personal property[2] to secure the annual advances and prior indebtedness.[3] PCA would commit to loan moneys up to a specified amount during a particular year and Norman Company would request and obtain advances under the commitment from time to time as necessary to pay bills incurred in its operations. PCA

1. Norman Company provided a feeding service for several thousand head of cattle throughout the fall of 1982. The great majority of these cattle were owned by various partnerships, and Norman Company supplied the cattle feeding services based on agreements with these partnerships.

2. The Federal Land Bank of Wichita held a lien on the real property on which Norman Company's feedlot was situated. The rights of the Federal Land Bank are not at issue in this case.

3. It is indicative of the size of Norman Company's obligations to PCA that when the loan was renewed on November 25, 1981, existing indebtedness was $1,568,403.61 and the renewal promissory note provided for advances to increase the indebtedness to $2,110,133.62 by the maturity date, August 1, 1982.

did not supply advances directly to Norman Company. Instead, Norman Company would issue sight drafts against PCA to pay specific bills. PCA would then review the bills and honor the drafts by making additional funds available under its loan commitment. In return, PCA would collect all the proceeds of Norman Company's accounts receivable to apply against the indebtedness. This arrangement was standard for all ranching and farming loans made by PCA and enabled PCA to assure that the proceeds of a debtor's collateral would be applied to reduce the debtor's obligations to PCA.

In August of 1982, PCA reviewed Norman Company's financial condition and concluded that it was deteriorating rapidly. At that time Howard Norman was exploring various possibilities for refinancing or sale of the feedlot business. PCA decided to allow Norman Company to continue to operate into December 1982. However, if the debt owed to PCA should still be outstanding at that time, PCA planned to foreclose; such action would result in closure of the feedlot business. In connection with this decision, PCA prepared a memorandum, executed by Howard Norman on behalf of Norman Company, outlining certain restrictions on Norman Company's operations from September into December 1982. The memorandum, dated September 17, 1982, stated in pertinent part:

1. No "new" cattle to be put on feed unless approved by [PCA]

. . . .

6. No other feed purchases except dry corn and protein—use own corn as soon as possible [4]

7. Prior approval from [PCA] on all disbursements over $500.00 and such disbursements supported by invoice or statement as of September 20, 1982

. . . .

11. It is understood and agreed by the undersigned the funds being advanced are to preserve and preserve and protect collateral pledged to [PCA] and is in no way a guarantee for future or further extension of credit:

PCA intended this memorandum to be confidential, but it contained nothing to indicate this intent.

In the latter part of 1982, C.J. Streit (Streit) became interested in purchasing certain assets of Norman Company, including the feedlot. Although Norman Company was the owner, negotiations for the sale were conducted between Streit and PCA. Streit testified that PCA controlled the moneys involved in the purchase because of its position as a secured creditor of Norman Company and a potential financing source for Streit. Roland Johnson (Johnson), who had been president of PCA during the times relevant to this dispute, testified however that PCA's primary involvement in the sale transaction was as a potential lender to Streit. Johnson stated that PCA would not have benefitted from Streit's purchase of the operation because PCA would have suffered approximately the same loss on its loan to Norman Company whether or not the sale between Streit and Norman Company was concluded.

Shortly after negotiations for the sale began, Streit moved approximately 750 head of his own cattle onto the Norman Company feedlot. PCA never expressly approved the addition of these cattle to the feedlot, but Johnson and Randall Ford (Ford), who had been the PCA loan officer and office manager at the relevant times, were aware that the cattle had been moved in and did not object to the additional cattle.

Streit testified that he wanted to keep the feedlot operation running throughout the negotiations because he preferred to purchase an ongoing business. Ford testified that the feedlot was kept open at the request of Howard Norman. Streit, Norman, and Ford met early in December to discuss the sale. Norman testified that during the meeting Ford and Streit requested he leave the room, and that at some point after the meeting they told him

---

**4.** Norman Company in fact harvested all corn grown by it in 1982 for use as silage; it contributed no dry corn of its own to the cattle feeding operation after the date of the memorandum.

that the feedlot was to remain open.[5] The lot continued in operation until total liquidation in March of 1983. The evidence suggests that all parties wished the feedlot to continue in operation, principally to facilitate a sale to Streit.

After negotiations with Streit began in December, PCA did not commence foreclosure proceedings as it had planned earlier. Instead, it allowed Norman Company to continue to operate despite the fact that the PCA loan commitment expired on December 15, 1982. PCA also continued to disburse funds after December 15, even though the disbursements exceeded its loan commitment limits.[6] PCA representatives testified that, with one minor exception,[7] these disbursements were made only for the purpose of preparing equipment and property for sale and for paying the salaries of Norman Company employees, and that therefore the disbursements were consistent with the decision to wind down Norman Company's operations. There was conflicting testimony that during this period PCA advanced funds to pay almost all of the feedlot's obligations except Duggan Corporation's bills for supplying corn.

Sometime after Streit began negotiating for the purchase, Norman Company began to place proceeds from collection of its accounts receivable in an escrow account, pursuant to an agreement with Streit.[8] The escrow account was maintained until Streit decided not to purchase the Norman Company assets in late February 1983. At that time the escrow account balance of approximately $250,000 was turned over to

PCA. In addition, PCA received payment from Streit of approximately $120,000 for feedlot services provided by Norman Company in connection with the 750 cattle Streit moved onto the lot in December.

Edmond Duggan (Duggan) operated Duggan Corporation, a trucking business that supplied corn to Norman Company for its feedlot operation. Duggan Corporation had been a regular supplier of corn to Norman Company for many years. Norman Company representatives testified that beginning in late November or early December of 1982, in accordance with the requirements of the September 17 memorandum between PCA and Norman Company, PCA was informed each time that Norman Company ordered corn from Duggan Corporation. Norman Company maintained that initially it called PCA before ordering corn to inform it that corn was needed and to obtain approval for the purchase. After Streit became involved in the purchase negotiations, he began approving the corn purchases.[9] Nevertheless, testimony indicated that after Streit's involvement a Norman Company representative continued to call PCA to inform it that corn was being ordered. Duggan testified that he was aware that PCA was being informed in advance of these purchases.

PCA loan officer Ford was present at the Norman Company feedlot during the period when Duggan Corporation was delivering corn,[10] and PCA was aware that cattle in the feedlot were eating corn that had been delivered by Duggan Corporation to Nor-

---

5. Ford testified that Norman was never asked to leave during this meeting.

6. The testimony differed on the amount of funds disbursed after the loan commitment ran out. Ford testified that approximately $120,000 was spent after this time, whereas Johnson testified that only $70,000 was advanced after December 15, 1982.

7. Payments were made to certain landlords of farm property leased to Norman Company to resolve disputes concerning compensation for landlords' shares of corn cut for silage, delivered to Norman Company, and commingled with Norman Company's silage.

8. Testimony concerning when PCA learned of the escrow account is in conflict. Ford testified

that PCA knew of the account shortly after it was established. In contrast, Johnson testified that PCA learned of the account's existence at the end of February 1983.

9. The office manager of Norman Company testified that PCA preferred that she "confront C.J. [Streit]" with operating decisions after December 20, 1982.

10. The testimony on how often Ford was present is in conflict. Ford testified that he visited Norman Company every other week. However, Norman Company's office manager testified that Ford was present "several days a week."

man Company after the loan commitment had run out. During Ford's visits to the feedlot, he also reviewed records indicating that Duggan Corporation was delivering corn to Norman Company during the period involved in this dispute. PCA president Johnson testified, however, that no PCA representative was making operating decisions for Norman Company; rather, Howard Norman made all business decisions for the company through February 1983.

Duggan Corporation was never paid for corn it supplied to Norman Company during the period from late November 1982 through early February 1983. Howard Norman showed Edmond Duggan a copy of the September 17 memorandum in early December when Duggan first inquired about the nonpayment. Duggan testified that he believed he was protected because the memorandum contemplated continued purchases of dry corn, and in the past PCA had always provided the funds for corn purchases based on sight drafts written by Norman Company. Norman also informed Duggan of the escrow account arrangement sometime in December, and Duggan expected to be paid from the escrowed funds once they were released upon completion of the sale to Streit. However, Duggan Corporation continued to supply the corn as an unsecured creditor. After Streit elected not to purchase the feedlot, Norman Company was financially unable to pay for the corn and Streit declined to pay. Duggan Corporation then sought payment from PCA in the latter part of March or early April of 1983, but this request was denied. PCA maintains that as a secured creditor it is entitled to the proceeds of accounts receivable and should not be required to pay Duggan Corporation, an unsecured creditor, out of those funds.

### B.

Duggan Corporation brought suit in Larimer County District Court seeking recovery of $101,586.41 for the purchase price of the corn delivered to Norman Company less a deduction for corn repossessed by Duggan Corporation and resold after the dispute arose.[11] Named as defendants were Norman Company, Streit and PCA. The claims of Duggan Corporation against Norman Company and Streit as well as counterclaims and cross-claims asserted by those parties have been resolved or dismissed and are not relevant to this certiorari review.

Duggan Corporation sought recovery against PCA based on theories of express contract and unjust enrichment. After trial to a jury, the jury returned a special verdict finding that there was no express contract by which PCA agreed to pay for the corn delivered by Duggan Corporation to Norman Company but that there was an "implied contract," based on a theory of unjust enrichment, and that Duggan Corporation had suffered damages in the amount of $101,586.38 by reason of PCA's failure to pay for the corn. On appeal, the Colorado Court of Appeals affirmed. We granted certiorari to consider the following issues:

Whether the court of appeals correctly ruled that as a matter of law [PCA] was unjustly enriched and, if so, that [PCA] is liable to Duggan [Corporation] even though [PCA] held a perfected security interest in Norman [Company's] assets. Whether the trial court erred in not submitting to the jury [PCA's] theory of the case, which was that [PCA] had a perfected security interest in Norman [Company's] assets.

### II.

The central issue in this case is whether a creditor that holds a perfected security interest in collateral can be held liable to an unsecured creditor based on a theory of unjust enrichment for benefits that enhance the value of the collateral. We conclude that this question cannot be answered categorically. Such a dispute involves tension between the priority system established in Article 9 of the Uniform Commercial Code (UCC or the Code)[12] and equitable principles of unjust enrichment.

---

**11.** No issue is presented in this case concerning the propriety of the repossession and resale.

**12.** The Uniform Commercial Code appears in Title 4, 2 C.R.S. (1973 & 1991 Supp.).

Although the policies underlying the UCC support a uniform, reliable system of priorities among creditors, we are unwilling to hold that alteration of that hierarchy of priorities is never necessary to implement the equitable principles on which the doctrine of unjust enrichment is based. A sketch of the UCC system of priorities and of the elements of a claim for unjust enrichment will serve as a background for consideration of cases that have grappled with the relationship between these two sets of principles.

Under Article 9 of the UCC, a creditor may obtain security for payment of an obligation by acquiring a security interest in a debtor's collateral. The basis of an enforceable security interest is a security agreement between the debtor and the creditor. Normally, this agreement will be in writing signed by the debtor, and will contain a description of the collateral covered by the agreement. *See* §§ 4–9–201, –203(1)(a), 2 C.R.S. (1973 & 1991 Supp.). A security interest does not come into being until the creditor has given value and the debtor has acquired rights in the collateral. § 4–9–203(1)(b) and (c). A creditor with a security interest has superior rights in the collateral as against the debtor and unsecured creditors. *See* §§ 4–9–201, –203(1), –301; 2 J. White & R. Summers *Uniform Commercial Code* § 24–6 (3d pract. ed. 1988). In order to protect its interest to the fullest, a creditor must "perfect" its security interest. *See* § 4–9–312. This normally entails filing a financing statement in the appropriate governmental office. §§ 44–9–302, –401. A creditor with a perfected security interest has priority over most other subsequent competing claims to the collateral. *See* § 4–9–312; 2 J. White & R. Summers, *Uniform Commercial Code* § 24–7. It is undisputed in this case that PCA held a perfected security interest in Norman Company's accounts receivable, and that Duggan Corporation was an unsecured creditor.

The UCC also provides for the application of equitable principles in cases governed by Article 9. According to section 4–1–103, "[u]nless displaced by the particular provisions of this title, the principles of law and equity ... shall supplement its provisions."[13] This section has been characterized as the "most important single provision in the Code." 1 J. White & R. Summers, *Uniform Commercial Code* § 5. The UCC was enacted to displace prior *legal* principles, not prior equitable principles.

> Code sections do not "occupy the equity field." Rather, general equitable principles remain largely intact, for they are only rarely "particularly displaced." In a sense, then, they are the main occupants of the relevant field. This follows from their basic character. Unlike general legal principles, they do not merely supplement Code sections; their function is also to carve exceptions from or otherwise modify Code sections, and the courts have recognized as much. These functions are not peculiar to the bearing of 1–103 equitable principles on Code rules; they are characteristic of the bearing of equitable principles upon legal rules throughout the law.
>
> . . . .
>
> With 1–103 and related law on the books, judges can escape the ancient dilemma of either adhering to the legal rule and doing an inequity, or of doing equity but in an unlaw-like fashion. Indeed, 1–103 imposes a duty on the judge to reach the equitable result unless the relevant general equitable principle has been particularly displaced.

*Id.* While equitable doctrines may have the effect of making Article 9 priority law less certain, "they offer flexibility in cases where applying the Code rigorously may result in an unfair outcome." *Id.* § 26–20.

██ Unjust enrichment, sometimes referred to as quasi-contract or contract im-

---

**13.** § 4–1–103, 2 C.R.S. (1973), provides in full:
 Unless displaced by the particular provisions of this title, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions.

plied in law, is an equitable doctrine that permits recovery when a plaintiff shows "(1) that a benefit was conferred on the defendant by the plaintiff, (2) that the benefit was appreciated by the defendant, and (3) that the benefit was accepted by the defendant under such circumstances that it would be inequitable for it to be retained without payment...." *Cablevision of Breckenridge v. Tannhauser Condominium Ass'n*, 649 P.2d 1093, 1096–97 (Colo. 1982); *accord Dass v. Epplen*, 162 Colo. 60, 424 P.2d 779 (1967). Since the doctrine of unjust enrichment has not been displaced by the particular provisions of Article 9, the doctrine may supplement its provisions. *See Producers Cotton Oil Co. v. Amstar Corp.*, 197 Cal.App.3d 638, 242 Cal.Rptr. 914, 927 (1988).

There is obvious tension between the doctrine of unjust enrichment and the priority system established by Article 9. When an unsecured creditor confers a benefit upon a secured creditor by adding to or enhancing the creditor's collateral and a claim for unjust enrichment against the secured creditor is recognized, the secured creditor in effect loses its priority status despite its compliance with the procedures set forth in Article 9. We have recognized in other settings, however, that the scope of the remedy under the doctrine of unjust enrichment "is broad, cutting across both contract and tort law, with its application guided by the underlying principle of avoiding the unjust enrichment of one party at the expense of another." *Cablevision*, 649 P.2d at 1097. The concept of unjust enrichment centers attention "on the prevention of injustice.... This wide and imprecise idea has played a creative role in the development of an important branch of modern law." Palmer, *Law of Restitution* § 1.1 (1978). We must determine whether the enrichment of a secured creditor as a result of benefits conferred by an unsecured creditor can ever be considered "unjust" and, if so, the standards that will govern that determination.

The court of appeals noted an apparent split of authority on the issue of the availability of an unjust enrichment claim in circumstances where it will upset the order of priorities established under Article 9 of the UCC. The court cited *Peerless Packing Co., Inc. v. Malone & Hyde, Inc.*, 376 S.E.2d 161 (W.Va.1988), and *Evans Products Co. v. Jorgensen*, 245 Or. 362, 421 P.2d 978 (1966), as cases supporting the view that a secured creditor's claim to collateral cannot be defeated by application of the doctrine of unjust enrichment. On the other side of the controversy it referred to *Producers Cotton Oil Co. v. Amstar Corp.*, 242 Cal.Rptr. 914, and *Borg–Warner Acceptance Corp. v. Valentine Associates Ltd. Corp.*, 192 Ga.App. 123, 384 S.E.2d 223 (1989). These latter cases both allowed a claim of unjust enrichment to prevail over the claim of a secured creditor. We believe that the results reached in these two lines of authority can be reconciled, although the courts' analyses are concededly in tension. The cases are factually distinguishable and consistent with a view that in appropriate circumstances a claim of unjust enrichment can be asserted successfully by an unsecured creditor against a secured creditor.

The facts in the cases denying an unsecured creditor's unjust enrichment claim against a secured creditor are complex. A common thread, however, runs through them. In each, the secured creditor had no more than general knowledge that an unsecured creditor was supplying goods to the debtor. There were no facts to indicate that the secured creditor initiated or encouraged the transaction by which the unsecured creditor enhanced the value of the secured collateral when the unsecured creditor supplied goods or services to the debtor. Thus, in *Peerless Packing* the secured creditor of a grocery store prevailed over unsecured creditors who asserted an unjust enrichment claim for groceries delivered during the week before the secured creditor foreclosed, took over operation of the store, and gave notice that it would not be responsible for debts incurred prior to foreclosure. The claim was based on the contention that the secured creditor allowed groceries to be delivered after it had formed the intent to foreclose one week earlier. There is no suggestion in the case

report that the secured creditor participated in ordering the groceries or otherwise initiated or encouraged the purchase of the groceries. *Peerless Packing*, 376 S.E.2d 161. Similarly, in *Evans Products* a secured creditor of a plywood manufacturer, with a lien on finished plywood, prevailed over an unsecured creditor who furnished raw material to the manufacturer and accepted finished plywood in payment. In holding for the secured creditor in a suit to foreclose against the supplier's plywood, the court rejected the defense that to permit the recovery without requiring payment for the raw material would unjustly enrich the secured creditor. The case report contains no indication that the secured creditor was even aware of the transaction between the unsecured supplier of raw material and the manufacturer.[14] *Evans Products*, 421 P.2d 978.

In rejecting the unjust enrichment claims of the unsecured creditors in *Peerless Packing* and *Evans Products*, the appellate courts reasoned that "[t]he purpose and effectiveness of the UCC [Uniform Commercial Code] would be substantially impaired if interests created in compliance with UCC procedure could be defeated by application of the equitable doctrine of unjust enrichment." *Evans Products*, 421 P.2d at 983; *Peerless Packing*, 376 S.E.2d at 164 (quoting *Evans Products*, 421 P.2d at 983).[15]

The leading case allowing an unsecured creditor asserting an unjust enrichment claim to prevail against a secured creditor is *Producers Cotton Oil*, 242 Cal.Rptr. 914. In that case, the foreclosure claim of a creditor holding a security interest in growing crops and proceeds was held subject to reduction by a claim of the purchaser of those crops on a theory of unjust enrichment for money spent by the purchaser in harvesting those crops without first obtaining the secured creditor's consent and subordination. The court stated:

> We agree with the position of [the purchaser] and hold that when a party possessing a security interest in a crop and its proceeds has knowledge of and acquiesces in expenditures made which are *necessary* to the development of the crop, and ultimately benefits from the expenditures, a party who, through mistake, pays such costs without first obtaining subordination, is entitled to recover.

*Producers Cotton Oil*, 242 Cal.Rptr. at 927 (emphasis in original).

The secured creditor in *Producers Cotton Oil* was held to have acquiesced in the expenditures necessary to harvest the crop that was subject to its security interest. Under these circumstances the court concluded that the creditor would be unjustly enriched if not required to pay the costs associated with the benefit produced by harvesting the crop. *Cf. Borg–Warner*, 384 S.E.2d 223.[16]

---

**14.** Two federal cases, not analyzed by the court of appeals in *Duggan*, follow the *Peerless Packing* and *Evans Products* line of reasoning. *South Shore Bank v. International Jet Interiors, Inc.*, 721 F.Supp. 29 (E.D.N.Y.1989) (secured creditor bank prevailed over unjust enrichment claim of unsecured creditor that remodeled interior of airplane on which bank held a security interest under circumstances where bank lacked specific awareness that remodeling was being accomplished); *Federal Deposit Insurance Corp. v. Quality Inns, Inc.*, 735 F.Supp. 1311 (D.Md. 1990) (unsecured creditor's unjust enrichment defense rejected where representations of secured creditor that allegedly caused unsecured creditor to furnish goods and services on credit and without security were made *after* goods and services had been furnished).

**15.** In *Peerless Packing* the Supreme Court of Appeals of West Virginia stated, however, that

"[w]e do not hold that an equitable claim for relief never lies in a case controlled by the UCC." It emphasized, nevertheless, that only "virtually fraudulent conduct" would justify such a claim in view of the strong policy for adherence to the priority system of the Uniform Commercial Code. *Peerless Packing*, 376 S.E.2d at 164–65 n. 4.

**16.** In *Borg–Warner*, the plaintiff-creditor provided floor-plan financing to a mobile home dealer and held a security interest in the dealer's inventory. The dealer contracted to sell a home under an installment sales contract, but the purchaser of the home rescinded before the sale became final. Before learning of the rescission, the defendant, who had purchased the installment sales contract from the dealer, had remitted to the plaintiff-creditor the sum required to release the home from the lien. The plaintiff-creditor later foreclosed its lien on the invento-

Viewing the evidence in the present case in the light most favorable to Duggan Corporation, the situation in *Duggan* is more closely analogous to *Producers Cotton Oil* than to the *Peerless Packing* line of cases. Indeed, the evidence of PCA involvement in *Duggan* is stronger than that present in *Producers Cotton Oil,* where an agent of the secured creditor was simply in the field at harvest time and was aware that a third party was harvesting the crops.

■ The central point of distinction between *Duggan* and *Producers Cotton Oil,* on the one hand, and the *Peerless Packing* line of cases on the other, is the extent to which the secured creditor was involved in the transaction by which the unsecured creditor supplied goods or services that enhanced the value of the secured collateral. Where a secured creditor does not itself initiate or encourage [17] the transaction that creates the unsecured obligation giving rise to the unjust enrichment claim, retention of any benefit realized by the secured creditor without compensating the supplier is not unjust and thus an unjust enrichment claim cannot be supported. Certainly a secured creditor is benefitted whenever the collateral that secures its loan is augmented or increased in value without expense to the secured creditor. Such a situation may arise when an unsecured creditor supplies goods to a debtor that automatically become part of the secured creditor's collateral; and in a sense it may seem unfair to allow the secured creditor to accept this benefit without having to pay its full cost. However, the priority system established by Article 9 of the Code contemplates that secured creditors can foreclose on their security interests in collateral free of debts owed by the debtor to junior unsecured creditors. *See* §§ 4–9–201, –310, –312, –317, 2 C.R.S. (1973 & 1991 Supp.). The UCC makes the unsecured creditor aware of the risks, and supplies a means by which such a creditor can learn in advance of the secured creditor's prior position by referring to the records in the appropriate governmental office. *See* § 4–9–401, and official comment.

The UCC priority system thus reflects the legislative judgment that the value of a predictable system of priorities ordinarily outweighs the disadvantage of the system's occasional inequities. At the same time, however, the Code recognizes that equitable principles may require alteration of the priority system in particular circumstances. *See* § 4–1–103. Although case-law concerning the application of the equitable doctrine of unjust enrichment in the Article 9 context is scarce, courts have frequently employed other equitable principles to create exceptions to the established priority system. *Thompson v. United States,* 408 F.2d 1075, 1081–85 (8th Cir. 1969) (lack of good faith on part of secured creditor towards the United States government, a junior creditor, held proper basis for altering Article 9 priorities); *Limor Diamonds, Inc. v. D'Oro by Christopher Michael, Inc.,* 558 F.Supp. 709, 711 (S.D.N.Y.1983) (secured party's rights in collateral may be subordinated to rights of holder of junior security interest based on lack of good faith); *Citizens State Bank v. Peoples Bank,* 475 N.E.2d 324, 326–28 (Ind. App.1985) (promissory estoppel principles can be used to subordinate the lien of a senior creditor); *Affiliated Foods, Inc. v. McGinley,* 426 N.W.2d 646 (Iowa App.1988) (senior creditor equitably estopped from asserting priority of its secured interest with respect to a junior secured creditor); *French Lumber Co., Inc. v. Commercial Realty & Finance Co., Inc.,* 346 Mass. 716, 195 N.E.2d 507 (1964) (doctrine of subroga-

---

ry including the home that was the subject of the transaction. The court held that the plaintiff would be unjustly enriched if allowed to retain the repossessed home as well as the sum paid to release it from the lien.

**17.** In *Producers Cotton Oil* the court held that the secured creditor's act of acquiescing in the harvesting of the secured collateral (crops) was a sufficient basis for holding the secured credi-

tor liable on the theory of unjust enrichment. However, in that case, the harvesting was necessary to the actual *preservation* of the secured collateral. *Producers Cotton Oil,* 242 Cal.Rptr. 914. Here, the delivery of corn was not essential to preserve the secured collateral, but instead served to augment or enhance its value. In such a case, more than mere acquiescence is required to hold a secured creditor liable on the basis of unjust enrichment.

**798**

tion utilized to alter secured creditor priorities under Article 9). Courts have also been willing to alter established priorities on the basis of fraudulent transfer principles. *See King v. Ionization Int'l, Inc.,* 825 F.2d 1180 (7th Cir.1987); *Kulik v. Albers, Inc.,* 91 Nev. 134, 532 P.2d 603 (1975).

Here, there was evidence that would have supported jury findings presenting the following picture: PCA permitted the continued operation of the feedlot in anticipation of closing a sale with Streit rather than liquidating the business as it had previously planned. PCA was the source of all operational funds for Norman Company's feedlot operations, controlled payment of all of its obligations, and received the proceeds of all of its accounts receivable. PCA was informed each time that corn was ordered and never objected to any purchase. Moreover, prior to entry of Streit upon the scene it specifically approved each order. A PCA representative actively reviewed records that evidenced the amount of corn being delivered to Norman Company, and its representative was present at Norman Company on some occasions when Duggan Corporation delivered corn. In addition, Howard Norman showed Edmond Duggan the September 17 memorandum that indicated PCA's intent to permit Norman Company to purchase dry corn. Duggan knew that moneys to pay for corn deliveries were historically obtained by Norman Company from advances made by PCA under the loan to Norman Company. Given these circumstances, Duggan Corporation continued to deliver corn to the Norman Company feedlot. The corn was used to feed the cattle. The owners of the cattle were billed based on weight gain. The proceeds of the accounts receivable so generated were ultimately transferred to PCA and applied toward Norman Company's obligations to PCA.[18]

In a situation where a secured creditor initiates or encourages transactions between the debtor and suppliers of goods or services, and benefits from the goods or services supplied to produce such debts, equitable principles require that the secured creditor compensate even an unsecured creditor to avoid being unjustly enriched. The equitable claim is at its strongest when the goods or services are necessary to preserve the security, as in *Producers Cotton Oil.* A secured creditor can protect itself from unjust enrichment claims by remaining uninvolved or by informing the proper parties of its intent not to pay for debts incurred in maintaining, enhancing, or making additions to secured collateral. Given the evidence concerning PCA's active role in creating a perception that the corn would be paid for, its failure to inform the parties otherwise, and the need for the corn to feed the cattle in order to produce accounts receivable subject to the PCA security interest, under appropriate instructions the jury could have found that the doctrine of unjust enrichment required that PCA compensate Duggan Corporation for the corn it delivered to the Norman Company feedlot.

### III.

We next must address PCA's argument that the trial judge erred by not properly instructing the jury on its theory of the case. The court of appeals determined that the trial court did not err in this respect. *Duggan,* 795 P.2d at 1351. We conclude that the jury instructions were inadequate and that the judgment entered on the jury verdict must be reversed.

### A.

In order to preserve this issue for review, PCA must have adequately objected to the instructions given by the court. C.R.C.P. 51. This requirement permits a trial court to correct or clarify erroneous or misleading instructions before such instructions are given to a jury, thus preventing costly retrials " 'necessitated by obvious

---

18. The $120,000 paid by Streit for cattle feeding services was based on services performed after Streit's cattle were delivered to Norman Company's feedlot in December 1982. Some of the approximately $250,000 proceeds of accounts receivable paid to PCA out of the escrow account may have been based on receivables generated before PCA stopped providing funds for corn purchases.

and prejudicial error.'" *Blueflame Gas, Inc. v. Van Hoose,* 679 P.2d 579, 586–87 (1984) (quoting *Scheer v. Cromwell,* 158 Colo. 427, 429, 407 P.2d 344, 345 (1965)). PCA's objection to the unjust enrichment instruction, taken in combination with its tendered instructions on the UCC aspects of the case and its assertion that the instructions as given did not adequately inform the jury of its theory of the case, was sufficient to preserve the issue of the propriety of the trial court's instructions for our review.

█ The following instruction on the theory of unjust enrichment was given to the jury:

In order for the Plaintiff, Ed Duggan, Inc., to recover from the Defendant, Ninth District Production Credit Association, upon an implied contract to pay for goods, you must find all of the following have been proved:

1. The Plaintiff delivered corn to Norman Land and Livestock Company;

2. The Plaintiff did so without a specific agreement as to compensation, but with the reasonable expectation that it would be paid the reasonable value of the corn by the Defendant, Ninth District Production Credit Association;

3. The delivery of corn by Plaintiff:

a. conferred a benefit on the Defendant, Ninth District Production Credit Association; and

b. the Defendant, Ninth District Production Credit Association, appreciated or realized the benefit; and

c. the Defendant, Ninth District Production Credit Association, accepted the benefit under such circumstances that it would be inequitable for the Defendant, Ninth District Production Credit Association, to retain the benefit without payment of the reasonable value of the corn.

4. The reasonable value of the corn delivered by Plaintiff and used by Norman Land and Livestock Company resulting in benefit to Defendant, Ninth District Production Credit Association.

If you find that any one or more of these propositions has not been proved by a preponderance of the evidence, then an implied contract has not been proven and you should answer question 4 on the Special Verdict "No".

On the other hand, if you find that all of these propositions have been proved by a preponderance of the evidence, then an implied contract has been proven and you should answer question 4 on the Special Verdict "Yes".[19]

Jury Instruction No. 23. This instruction sets forth the elements of unjust enrichment as enunciated in *Cablevision* and *Dass v. Epplen.* However, it does not set forth standards by which the jury could determine whether it was inequitable for PCA to retain the benefit of Duggan Corporation's delivery of corn without paying for its reasonable value. Because of the special considerations involved when an unjust enrichment claim is asserted by an unsecured creditor against a creditor secured by a lien created under the UCC, we do not believe that the jury could fairly resolve this issue consistent with the law without further instructions from the court.

Nevertheless, the instructions tendered by PCA were properly rejected. PCA's tendered instructions suggest that a secured creditor's right to obtain the full benefit of its collateral is absolute.[20] In

---

19. The instruction was derived from the model jury instruction for a contract implied in fact, CJI–Civ.3d 30:31, and counsel for Duggan Corporation termed the claim one for an "implied contract," without specifying whether the contract was implied in fact or in law. Paragraph 3 of the instruction requires that all the elements of an unjust enrichment claim be proven and therefore properly sets forth the elements of a claim for unjust enrichment, sometimes referred to as a contract implied in law. Paragraph 2 of the instruction, however, is appropriate only for a claim based on contract implied in fact and should not have been included. *See* Section III B, below.

20. PCA's tendered instructions stated in part:

Under laws of the State of Colorado, it is not unjust enrichment for a secured creditor to receive the collateral or security described or covered by a financing statement and a security agreement.

PCA's tendered Instruction No. 5.

proper circumstances, however, an unsecured creditor may obtain compensation from a secured creditor under a claim for unjust enrichment. The distinction that must be drawn in these situations is that between permissible enrichment under Article 9 and *unjust* enrichment. Under Article 9 a secured creditor is ordinarily authorized to maintain its security interest in collateral and its position of priority without assuming responsibility for unsecured obligations of the debtor even if those obligations were incurred for goods or services that enhanced the value of the collateral—this is not unjust enrichment. On the other hand, if the secured creditor initiates or encourages transactions by which such obligations are incurred and derives a benefit from such transactions, the secured creditor may be held liable on an unjust enrichment claim. A jury cannot be presumed to understand the interrelation of the doctrine of unjust enrichment and the law of secured transactions and therefore must be apprised of how a seeming conflict between the two is to be resolved.

In keeping with the previously stated principles, we suggest that the following instruction on an inequitable retention of benefit by a secured creditor would have been appropriate under the evidence presented at the trial in this case:

PCA is a secured creditor with rights in the accounts receivable and other personal property of Norman Company that ordinarily are superior to any rights of an unsecured creditor such as Duggan Corporation. It is not inequitable for a secured creditor to retain a benefit conferred by an unsecured creditor without compensating the unsecured creditor if the secured creditor does not initiate or encourage the transaction between the unsecured creditor and the debtor by which that benefit is conferred. However, when the benefit is provided under circumstances where the secured creditor initiates or encourages such transaction, it is inequitable for the secured creditor to retain the benefit without compensating the unsecured creditor. If you determine that Duggan Corporation conferred a benefit on PCA, you must apply this instruction in determining whether it was inequitable that PCA retain the benefit without compensating Duggan Corporation.

*Cf. Producers Cotton Oil,* 242 Cal.Rptr. at 927 (discussed above).

### B.

■ As noted in footnote 19 of this opinion, paragraph 2 of Jury Instruction No. 23 erroneously included reliance as an element of a claim for unjust enrichment. The theory underlying the instruction as given was referred to generically as "implied contract" and contained elements of both a contract implied in fact and a contract implied in law. The instruction specifically required, as an element of a contract implied in law, that Duggan Corporation delivered corn to Norman Company "without a specific agreement as to compensation, but with the reasonable expectation that it would be paid the reasonable value of the corn by [PCA]." Jury Instruction No. 23. The elements of a claim for unjust enrichment are correctly set forth in paragraph 3 of that instruction. On retrial, the court should not include paragraph 2 of Jury Instruction No. 23 in instructing the jury on the elements of Duggan Corporation's claim for unjust enrichment.

---

You are instructed that the Statutes of the State of Colorado in full force and effect at all times pertinent here provide that "the mere existence of a security interest or authority given to the debtor to dispose of or use collateral does not impose contract or tort liability upon the secured party for the debtor's acts or omissions."
PCA's tendered Instruction No. 6.
A creditor who delivers corn without a financing statement and security agreement is an unsecured creditor. A filed financing statement and security agreement gives a secured creditor prior rights to any corn delivered by an unsecured creditor.
PCA's tendered Instruction No. 7.
The Production Credit Association was a secured creditor under the laws of the State of Colorado and was legally entitled to the accounts receivable of [Norman Company]. [Duggan Corporation] is charged with such knowledge and in furnishing feed to [Norman Company], acted as an unsecured creditor.
PCA's tendered Instruction No. 9.

## C.

PCA also argues that the trial court erred in its instruction to the jury on the element of benefit. We address this argument because the issue may arise again on retrial.

The trial court instructed that

[a] person confers a benefit upon another if he gives to the other possession of, or an interest in, personal property. He confers a benefit not only where he adds to the property of another, but also where he saves the other from expense or loss. The word "benefit", therefore, denotes any form of advantage.

Jury Instruction No. 25. PCA argues that this instruction was given in error because it required the jury to find in favor of Duggan Corporation if it found that PCA received any sort of benefit. This argument mischaracterizes the instructions. "All of the court's instructions ... are to be read and considered as a whole in determining whether all the necessary law has been correctly stated to the jury." *Montgomery Ward & Co. v. Kerns*, 172 Colo. 59, 63, 470 P.2d 34, 36–37 (1970). Instruction 25 defines the term "benefit" as it is used in Instruction 23, and paragraph 3 of Instruction 23 clearly states that PCA must have "accepted the benefit under such circumstances that it would be inequitable for [PCA] to retain the benefit without payment of the reasonable value of the corn." The benefit in question, when the instructions are read together, was the benefit derived by PCA when corn was delivered. The corn permitted the feedlot to continue in operation and generated accounts receivable that were then automatically subject to the security interest of PCA. We find no error in Instruction 25 in the context of the evidence as presented and the instructions as given.

## IV.

We are persuaded that in certain circumstances a secured creditor can be held liable to an unsecured creditor on the basis of unjust enrichment notwithstanding its secured status. Where a secured creditor is benefitted by a transaction between its debtor and an unsecured creditor that enhances the value of the secured collateral, and the secured creditor initiates or encourages the transaction, the secured creditor can be held liable to the unsecured creditor on the theory of unjust enrichment. The jury instructions given here, however, were not adequate to enable the jury to resolve the unjust enrichment issue in accordance with the applicable law. We therefore reverse the judgment of the court of appeals and return the case to that court with directions to reverse the judgment of the trial court and remand the case for a new trial.

VOLLACK, J., dissents, and ROVIRA, C.J., and ERICKSON, J., join in the dissent.

Justice VOLLACK dissenting:

The majority states that the central issue in this case is "[w]hether a creditor that holds a perfected security interest in collateral can be held liable to an unsecured creditor based on a theory of unjust enrichment for benefits that enhance the value of the collateral," and then observes that "[s]uch a dispute involves tension between the priority system established in Article 9 of the Uniform Commercial Code (U.C.C.) and equitable principles of unjust enrichment." Maj. op. at 793–794. I disagree because neither this issue, nor such a tension, is raised by the facts in this case. PCA's status as a secured creditor is not relevant to whether an express or implied contract exists between Duggan and PCA. Duggan is not claiming a priority or interest in collateral or proceeds held by PCA under its perfected security agreement with Norman. Instead, Duggan is claiming that, by its conduct, PCA has an obligation under an implied contract theory to pay Duggan the reasonable value of the corn that Duggan delivered to Norman.

## I.

The cases cited by the majority, which have addressed the relationship between Article 9 of the U.C.C. and unjust enrichment, do not in my opinion apply to the

facts in this case because those cases involved disputes over specific collateral or identified proceeds in which one of the parties had a security interest. *See Producers Cotton Oil Co. v. Amstar Corp.*, 197 Cal. App.3d 638, 242 Cal.Rptr. 914 (1988); *Borg–Warner Acceptance Corp. v. Valentine Assoc. Ltd.*, 192 Ga.App. 123, 384 S.E.2d 223 (1989). The present case does not involve a dispute over collateral or proceeds but, as stated above, is a dispute over whether PCA has an obligation to pay Duggan under an implied contract theory.

In *Producers Cotton Oil*, which the majority finds analogous to the facts in this case, Producers had a perfected security interest in the crops and proceeds of Borboa's farm operation. Borboa contracted to sell his crop to Amstar. When Producers was informed of the crop sale, they sent Amstar an assignment of crop proceeds. Amstar agreed to assign the proceeds to Producers, subject to deduction for the indebtedness of Borboa. *Producers Cotton Oil*, 242 Cal.Rptr. at 916.

In 1981, Amstar mistakenly paid the harvesting expenses for Borboa's crop. The 1981 crop yielded proceeds of $231,108.76. Amstar assigned $166,019.38 to Producers after deducting harvesting and other expenses. Producers demanded payment for these deductions. After Amstar refused to pay Producers, Producers brought an action against Amstar, claiming the deductions violated its security interest and constituted conversion of the proceeds. *Id.* at 917.

The dispute in *Producers Cotton Oil* concerned which party had the better right to the "proceeds" that were deducted by Amstar. *Id.* The court concluded that

Producers had a valid security interest in the proceeds *and* that Amstar had a valid claim to the proceeds based on unjust enrichment. The court then had to determine which claim prevailed over the other. The court held that the unjust enrichment claim prevailed, but limited its decision to the particular facts of the case.[1] *Id.* at 927.

The distinction between *Producers Cotton Oil* and the present case is apparent. In *Producers Cotton Oil*, the parties were disputing their rights to proceeds in which Producers had a secured interest, specifically, the amount that Amstar deducted from the crop proceeds.[2] In the present case, no such dispute exists because Duggan's implied contract claim does not assert a right to any secured interest held by PCA under the security agreement with Norman.[3]

In his complaint, Duggan did not assert any claim for relief based on a priority or interest in collateral or proceeds held by PCA. Moreover, Duggan did not contest PCA's position as a secured creditor in Norman's assets. Instead, Duggan based his claim for relief on PCA's conduct. Specifically, Duggan asserts that the PCA/Norman relationship was not an ordinary lender/debtor relationship because PCA had control of the feedlot's activities, including the ordering and delivery of corn.

In this case, without some dispute over a secured item, the fact that PCA was a secured creditor is not relevant to a determination of whether PCA is obligated to pay Duggan for the corn based on a theory of implied contract to avoid unjust enrichment.[4] A secured creditor, like anyone

---

1. Notably, the court did not establish a standard for all future cases.

2. The majority also cites *Borg–Warner Acceptance Corp. v. Valentine Associates Ltd. Corp.*, 192 Ga.App. 123, 384 S.E.2d 223 (1989), in which a court allowed a claim for unjust enrichment to prevail over a party's security interest. In *Borg–Warner*, the parties were disputing who had the better right to a mobile home and the proceeds from the sale of the mobile home. Borg–Warner had a security interest in both the mobile home and the proceeds.

3. While Duggan did not claim unjust enrichment to recover specific proceeds, as Amstar did in *Producers Cotton Oil*, he did discuss PCA's collection of the monies placed in escrow by Streit as an *example* of a benefit that PCA received from Duggan's corn.

4. As the trial court stated:
    The Court is not giving the instructions as to the U.C.C. aspects. That might be appropriate if the case was tried under another type of theory. If the plaintiff was attempting to get back its corn, the question would then be pursuant to law, what lien or possession

else, can enter into an implied (or express) contract that creates an obligation to pay. As PCA stated in its closing argument, the issue in this case is "whether the Production Credit Association [PCA] somehow stepped in and *made an agreement*, took on an obligation that it never intended to take on." (Emphasis added.)

## II.

Duggan's claim for relief is one of contract. Thus, as the trial court instructed, contract law controls the disposition of the issues in this case, and the Uniform Commercial Code is not applicable. The trial court gave instruction No. 23,[5] which in my opinion correctly stated the law applicable to the evidence and Duggan's asserted claim of implied contract. The case was submitted to the jury on special interrogatories as to express and implied contract.[6]

In order to recover on a theory of implied contract to avoid unjust enrichment, Duggan had to prove, as provided in instruction No. 23, (1) that a benefit was conferred on the defendant by the plaintiff, (2) that the benefit was appreciated by the defendant, and (3) that the benefit was accepted by the defendant under such circumstances that it would be inequitable for it to be retained without payment of its value. *Cablevision of Breckenridge, Inc. v. Tannhauser Con-*

*dominium Assoc.*, 649 P.2d 1093, 1096–97 (Colo.1982). In the present case, the evidence clearly satisfies all three of these elements.

The jury could reasonably conclude that Duggan conferred a benefit on PCA and that PCA appreciated the benefit. PCA was informed each time that corn was ordered and never objected, and for a period of time specifically approved each order. A PCA representative was present at the feedlot on several occasions when corn was delivered. A PCA representative actively reviewed records that evidenced the amount of corn being delivered to Norman. PCA directed that the feedlot remain open in anticipation of a proposed sale.

The jury's verdict that it would be inequitable to retain the benefit without payment is supported by Norman's showing Duggan the September 17 memorandum that indicated PCA's intent to permit Norman to purchase dry corn. Also, PCA was the source of all operational funds for Norman's feedlot operations, controlled payments of all its obligations, and received the proceeds of all its accounts receivable. Norman was not permitted by PCA to retain or expend funds collected by the feedlot. Duggan knew that payment for corn deliveries to Norman historically came from advances made by PCA to Norman.

rights, rather, pursuant to the Uniform Commercial Code might the defendant have, so the security interest is not applicable to the expressed or implied contract issues shown by the evidence of this case.

5. This instruction was based on pattern jury instruction CJI–Civ.3d 30:31.

6. These special interrogatories, with the jury's responses, were as follows:

1. Was there an "express contract" to pay for corn delivered to Norman Land and Livestock company between Plaintiff, Ed Duggan, Inc. and Defendant, Ninth District Production Credit Association? (yes or no)
ANSWER NO. 1: No
2. Did the Plaintiff, Ed Duggan, Inc., incur damages as a result of the express contract which you have found existed between Plaintiff, Ed Duggan, Inc., and Defendant, Ninth District Production Credit Association? (yes or no)
ANSWER NO. 2: __

3. State the amount of damages, if any, incurred by the Plaintiff, Ed Duggan, Inc., due to its express contract with the Defendant, Ninth District Production Credit Association?
ANSWER NO. 3: $_____
4. Was there an "implied contract" to pay for corn delivered to Norman Land and Livestock Company between Plaintiff, Ed Duggan, Inc., and Defendant, Ninth District Production Credit Association? (yes or no)
ANSWER NO. 4: Yes
5. Did Plaintiff, Ed Duggan, Inc., incur damages as a result of the implied contract which you have found existed between Plaintiff, Ed Duggan, Inc., and Defendant, Ninth District Production Credit Association? (yes or no)
ANSWER NO. 5: Yes
6. State the amount of damages, if any, incurred by the Plaintiff, Ed Duggan, Inc., due to its implied contract with Defendant, Ninth District Production Credit Association?
ANSWER NO. 6: $101,586.38

## III.

The majority's new standard and requirement that an additional instruction be given to inform the jury of the interrelation of the doctrine of unjust enrichment and Article 9 of the U.C.C. is misplaced.[7] The instructions given by the trial court were proper and do not need to be supplemented by additional instructions to provide the jury with an understanding of the law of implied contract. The jury, in applying the evidence to the instructions of law, concluded that Duggan was entitled to damages.

The fact that PCA is a secured creditor would only be relevant if Duggan were claiming that PCA's priority was junior to his claim of an implied contract to avoid unjust enrichment. In such a case, the court would have to decide whether PCA's security interest or Duggan's contract claim controls. The majority does not identify the security, if any, in which Duggan is claiming an interest. Without such a dispute, Article 9 of the U.C.C. is not applicable. I agree with the trial court and the court of appeals that the instructions should not include any reference to PCA's U.C.C. interest. I would affirm the jury verdict.

I am authorized to say that Chief Justice ROVIRA and Justice ERICKSON join in this dissent.

---

**7.** Additionally, the majority's decision sets a precedent that changes future equity claims brought under § 4–1–103, 2 C.R.S. (1973). The majority is essentially adding a requirement to § 4–1–103 that does not exist in the statute. The statute does not require a plaintiff to meet a special standard before asserting one of these claims.